UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
25-CR-80105-MIDDLEBROOKS/MATHEWMAN
Case No._____

18 U.S.C. § 1349
18 U.S.C. § 371
18 U.S.C. § 982(a)(7)

UNITED STATES OF AMERICA

vs.

SEAN J. ALTERMAN,

Defendant.
_____/

FILED BY ___BM___ D.C.

Jun 27, 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## INFORMATION

The United States Attorney charges that:

### GENERAL ALLEGATIONS

At all times material to this Information:

#### Medicare Program

1. The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2. Medicare was a "health care benefit program," as defined by 18 U.S.C. § 24(b), and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3. Medicare covered different types of benefits and was separated into different program "parts." Medicare "Part A" covered health services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare "Part B" was a medical insurance program that covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits, minor surgical procedures, and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

4. Physicians, clinics, laboratories, and other health care providers (collectively, "providers") that provided services to beneficiaries were able to apply for and obtain a "provider number." A provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

5. A Medicare claim was required to contain certain important information, including: (a) the beneficiary's name and Health Insurance Claim Number ("HICN") or Medicare Beneficiary Identification ("MBI") number; (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other health care provider, as well as a unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI").

6. When submitting claims to Medicare for reimbursement, providers were required to certify that: (a) the contents of the forms were true, correct, and complete; (b) the forms were prepared in compliance with the laws and regulations governing Medicare; and (c) the items and services that were purportedly provided, as set forth in the claims, were medically necessary.

7. Medicare would not reimburse providers for claims that were procured through the payment of kickbacks and bribes.

8. CMS acted through fiscal agents called Medicare Administrative Contractors ("MACs"), which were statutory agents for CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries. The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

9. First Coast Service Options Inc. ("First Coast") was the MAC for the consolidated Medicare jurisdictions that included the state of Florida.

10. To receive Medicare reimbursement, providers had to make appropriate applications to the MAC and execute a written provider agreement. The Medicare provider enrollment application for laboratories, CMS Form 855B, was required to be signed by an authorized representative of the provider. CMS Form 855B contained a certification that stated:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

11. CMS Form 855B contained additional certifications that the provider "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

12. Payments under Medicare Part B were often made directly to the provider rather than to the patient or beneficiary. For this to occur, the beneficiary would assign the right of

payment to the provider. Once such an assignment took place, the provider would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

### Genetic Testing

13. Various forms of genetic testing existed using DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain diseases or health conditions in the future. For example, cardiovascular genetic testing (referred to herein as "cardio testing") used DNA sequencing to detect mutations in genes that could indicate an increased risk of developing serious cardiovascular conditions and could assist in the treatment and management of a patient who had signs and symptoms of a cardiovascular disease or condition. Primary immunodeficiency genetic testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain immunodeficiencies. Cardio testing and primary immunodeficiency genetic testing are referred to herein collectively as "genetic tests" or "genetic testing."

14. Medicare did not cover laboratory testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." 42 C.F.R. § 411.15(a)(1).

15. If laboratory testing was necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem

4

and who uses the results in the management of the beneficiary's specific medical problem." 42 U.S.C. § 410.32(a).

### The Defendant, Related Entities, and Relevant Persons

16. Live Beyond Medical MGMT, LLC ("Live Beyond") was a limited liability company formed under the laws of Wyoming with its principal place of business in Palm Beach County, Florida. Live Beyond was an independent laboratory that purportedly conducted genetic testing.

17. Dynix Diagnostics, LLC ("Dynix") was a limited liability company formed under the laws of Florida with its principal place of business in Martin County, Florida. Dynix was an independent laboratory that purportedly conducted genetic testing.

18. Shivv LLC ("Shivv") was a limited liability company formed under the laws of Wyoming with its principal place of business in Sheridan County, Wyoming.

19. Shank LLC ("Shank") was a limited liability company formed under the laws of Florida with its principal place of business in Palm Beach County, Florida.

20. Company 1 was a limited liability company formed under the laws of Florida with its principal place of business in Palm Beach County, Florida.

21. Company 2 was a corporation formed under the laws of Florida with its principal place of business in Palm Beach County, Florida.

22. Defendant **SEAN J. ALTERMAN**, a resident of Palm Beach County, Florida, was an owner and operator of Live Beyond, Dynix, Shivv, and Shank.

23. Co-Conspirator 1, a resident of Palm Beach County, Florida, was an owner, operator, and manager of Company 1 and Company 2.

## COUNT 1
## Conspiracy to Commit Health Care Fraud
## (18 U.S.C. § 1349)

1. The General Allegations section of this Information is re-alleged and incorporated by reference as though fully set forth herein.

2. From in or around January 2021, and continuing through in or around October 2023, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

**SEAN J. ALTERMAN**,

did knowingly and willfully, that is, with the intent to further the object of the conspiracy, combine, conspire, confederate, and agree with Co-Conspirator 1 and others known and unknown to the United States Attorney to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

### Purpose of the Conspiracy

3. It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by, among other things: (a) enrolling Live Beyond and Dynix as Medicare providers by falsely certifying to CMS that these laboratories would comply with applicable rules and regulations; (b) conducting deceptive telemarketing campaigns to convince beneficiaries to agree to take genetic tests, regardless of whether they needed the tests; (c) using deceptive means to obtain doctors' orders authorizing medically unnecessary genetic testing for these beneficiaries; (d) offering and paying illegal kickbacks and bribes in exchange for the referral

of beneficiaries and signed doctors' orders for genetic testing to laboratories; (e) submitting and causing the submission of false and fraudulent claims to Medicare for genetic tests that were medically unnecessary, ineligible for reimbursement, and procured through the payment of illegal kickbacks and bribes; (f) concealing and causing the concealment of illegal kickback payments; and (g) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the conspiracy.

### Manner and Means

The manner and means by which the defendant and his co-conspirators sought to accomplish the object and purpose of the conspiracy included, among other things, the following:

4. To enable Live Beyond and Dynix to bill Medicare for expensive genetic tests, **SEAN J. ALTERMAN** falsely certified to Medicare that he, as well as Live Beyond and Dynix, would comply with all Medicare rules and regulations, would not pay illegal kickbacks and bribes, and would not knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare.

5. **SEAN J. ALTERMAN**, through Live Beyond and Dynix, hired patient recruiters, including Co-Conspirator 1 (through Company 1 and Company 2), to target beneficiaries with deceptive telemarketing campaigns to induce them to agree to take genetic tests regardless of medical necessity.

6. **SEAN J. ALTERMAN**, through Live Beyond and Dynix, also hired patient recruiters, including Co-Conspirator 1 (through Company 1 and Company 2), to obtain doctors' orders authorizing medically unnecessary genetic testing for beneficiaries using a deceptive marketing tactic known as "doctor chasing." As **ALTERMAN** knew, Co-Conspirator 1 and others sent and caused to be sent faxes and materials containing false, fraudulent, and misleading

representations to beneficiaries' doctors to induce these doctors to sign orders for genetic tests that were medically unnecessary and ineligible for Medicare reimbursement, as the doctors did not meet with and examine the beneficiaries for the tests, were not treating the beneficiaries for the diseases or symptoms of the diseases underlying the tests, and did not use the test results to treat the beneficiaries.

7. **SEAN J. ALTERMAN**, Co-Conspirator 1, and other co-conspirators, who were not medical professionals, selected the type of genetic testing and the diagnosis and procedure codes to be used for the genetic tests, and which laboratories would bill for the genetic tests in a manner designed to maximize Medicare reimbursements and conceal the nature of the scheme.

8. **SEAN J. ALTERMAN**, through Live Beyond and Dynix, paid patient recruiters, including Co-Conspirator 1 (through Company 1 and Company 2), illegal kickbacks and bribes in exchange for beneficiary referrals and signed doctors' orders authorizing genetic tests that were induced through deception and trickery.

9. **SEAN J. ALTERMAN**, Co-Conspirator 1, and other co-conspirators disguised these illegal kickbacks and bribes as payments for legitimate marketing services.

10. **SEAN J. ALTERMAN**, Co-Conspirator-1, and other co-conspirators, through Live Beyond and Dynix, billed and caused to be billed to Medicare genetic testing that was medically unnecessary, procured through illegal kickbacks and bribes, and ineligible for reimbursement.

11. **SEAN J. ALTERMAN**, Co-Conspirator-1, and other co-conspirators caused Live Beyond to submit false and fraudulent claims to Medicare in at least the approximate amount of $20 million for genetic testing. As the result of these false and fraudulent claims, Medicare made payments to Live Beyond in at least the approximate amount of $15 million.

12. **SEAN J. ALTERMAN**, Co-Conspirator-1, and other co-conspirators caused Dynix to submit false and fraudulent claims to Medicare in at least the approximate amount of $32 million for genetic testing. As the result of these false and fraudulent claims, Medicare made payments to Dynix in at least the approximate amount of $21 million.

13. **SEAN J. ALTERMAN**, personally, and through Shivv and Shank, received approximately $5.5 million from Live Beyond and Dynix as a result of the conspiracy.

14. **SEAN J. ALTERMAN**, Co-Conspirator 1, and other co-conspirators used the proceeds of the fraud to benefit themselves and others, and to further the fraud.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2
### Conspiracy to Offer and Pay Health Care Kickbacks
### (18 U.S.C. § 371)

1. The General Allegations section of this Information is re-alleged and incorporated by reference as though fully set forth herein.

2. From in or around January 2021, and continuing through in or around October 2023, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

**SEAN J. ALTERMAN**,

did knowingly and willfully, that is, with the intent to further the object of the conspiracy, combine, conspire, confederate, and agree with Co-Conspirator 1 and others known and unknown to the United States Attorney to violate Title 42, United States Code, Section 1320a-7b(b)(2)(A), by offering and paying any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any service and item for which payment may be made in whole or in part under a Federal health care program, that is, Medicare.

### Purpose of the Conspiracy

3. It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by, among other things: (a) falsely certifying to CMS that Live Beyond and Dynix would refrain from paying illegal kickbacks and bribes, so that Live Beyond and Dynix could bill Medicare for expensive genetic testing; (b) conducting deceptive telemarketing campaigns to induce beneficiaries to agree to take genetic tests, regardless of whether they needed the tests; (c) using deceptive means to obtain doctors' orders authorizing medically unnecessary genetic testing for these beneficiaries; (d) offering and paying illegal kickbacks and bribes in exchange for the referral of beneficiaries and signed doctors' orders for genetic testing to Live Beyond and Dynix that were induced through deception and trickery; (e) concealing and causing the concealment of these kickback payments; (f) submitting and causing the submission of claims to Medicare for genetic tests that were procured through the payment of illegal kickbacks and bribes; and (g) diverting the proceeds of the conspiracy for their personal use and benefit, the use and benefit of others, and to further the conspiracy.

### Manner and Means

4. The Manner and Means section of Count 1 of this Information is re-alleged and incorporated by reference as though fully set forth herein.

### Overt Acts

In furtherance of the conspiracy, and to accomplish its object and purpose, at least one co-conspirator committed and caused to be committed, in the Southern District of Florida, at least one of the following overt acts, among others:

1. On or about March 3, 2021, **SEAN J. ALTERMAN** signed the CMS Form 855B on behalf of Live Beyond and certified that Live Beyond would not offer or pay illegal kickbacks and bribes.

2. On or about September 1, 2021, **SEAN J. ALTERMAN**, through Live Beyond, offered and paid Co-Conspirator 1 approximately $1,180,000 via check made payable to Company 1, which was an illegal kickback and bribe in exchange for referring beneficiaries and doctors' orders for genetic testing.

3. On or about February 8, 2022, **SEAN J. ALTERMAN**, through Live Beyond, offered and paid Co-Conspirator 1 approximately $750,000 via check made payable to Company 1, which was an illegal kickback and bribe in exchange for referring beneficiaries and doctors' orders for genetic testing.

4. On or about October 3, 2023, **SEAN J. ALTERMAN**, through Dynix, offered and paid Co-Conspirator 1 approximately $425,000 via check made payable to Company 2, which was an illegal kickback and bribe in exchange for referring beneficiaries and doctors' orders for genetic testing.

All in violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATIONS

1. The allegations of this Information are re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of certain property in which the defendant, **SEAN J. ALTERMAN**, has an interest.

2. Upon conviction of a violation of Title 18, United States Code, Sections 1349 and 371, as alleged in this Information, the defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable

to the commission of the offense, pursuant to Title 18, United States Code, Section 982(a)(7).

3. The property subject to forfeiture as a result of the alleged offenses includes, but is not limited to, the following:

    a. Real property located at 11230 Alligator Trail, Lake Worth, Florida 33449, including all buildings, fixtures, appurtenances, improvements, attachments, and easements found therein or thereon,

Lot 240, Homeland, according to the map or plat thereof recorded in Plat Book 33, Page(s) 111 through 117, inclusive, of the Public Records of Palm Beach County, Florida.

Property Control Number: 00-41-44-35-01-000-2400.



b. 2022 Rolls Royce Ghost VIN SCATV0C05NU209168.



4. If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p).

All pursuant to Title 18, United States Code, Section 982(a)(7), and the procedures set forth in Title 21, United States Code, Section 853, as incorporated by Title 18, United States Code, Section 982(b)(1).

*[signature]*

HAYDEN P. O'BYRNE
UNITED STATES ATTORNEY

LORINDA I. LARYEA, ACTING CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

*[signature]*

REGINALD CUYLER JR.
AISHA SCHAFER HYLTON
TRIAL ATTORNEYS
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

SEAN J. ALTERMAN,

_____/
                Defendant.

CASE NO.: 25-CR-80105-MIDDLEBROOKS/MATHEWMAN

**CERTIFICATE OF TRIAL ATTORNEY**

**Superseding Case Information:**
New Defendant(s) (Yes or No) _____
Number of New Defendants _____
Total number of new counts _____

**Court Division** (select one)
☐ Miami   ☐ Key West   ☐ FTP
☐ FTL     ☑ WPB

I do hereby certify that:

1. I have carefully considered the allegations of the Indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.
2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, 28 U.S.C. §3161.
3. Interpreter: (Yes or No) No
   List language and/or dialect: _____
4. This case will take __0__ days for the parties to try.
5. Please check appropriate category and type of offense listed below:

   (Check only one)
   I   ☑ 0 to 5 days
   II  ☐ 6 to 10 days
   III ☐ 11 to 20 days
   IV  ☐ 21 to 60 days
   V   ☐ 61 days and over

   (Check only one)
   ☐ Petty
   ☐ Minor
   ☐ Misdemeanor
   ☑ Felony

6. Has this case been previously filed in this District Court? (Yes or No) No
   If yes, Judge _____ Case No. _____
7. Has a complaint been filed in this matter? (Yes or No) No
   If yes, Judge _____ Magistrate Case No. _____
8. Does this case relate to a previously filed matter in this District Court? (Yes or No) No
   If yes, Judge _____ Case No. _____
9. Defendant(s) in federal custody as of _____
10. Defendant(s) in state custody as of _____
11. Rule 20 from the _____ District of _____
12. Is this a potential death penalty case? (Yes or No) No
13. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)? (Yes or No) No
14. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No
15. Did this matter involve the participation of or consultation with Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? No
16. Did this matter involve the participation of or consultation with Magistrate Judge Ellen F. D'Angelo during her tenure at the U.S. Attorney's Office, which concluded on October 7, 2024? No

By: _____
REGINALD CUYLER JR.
DOJ Trial Attorney
FL Bar No.    0114062

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name**: _____ SEAN J. ALTERMAN _____

**Case No**: _____

Count #: 1

Title 18, United States Code, Section 1349

Conspiracy to Commit Health Care Fraud
* Max. Term of Imprisonment: 10 years
* Mandatory Min. Term of Imprisonment (if applicable): N/A
* Max. Supervised Release: 3 years
* Max. Fine: $250,000 or twice the gross gain or loss from the offense

Count #: 2

Title 18, United States Code, Section 371

Conspiracy to Offer and Pay Health Care Kickbacks
* Max. Term of Imprisonment: 5 years
* Mandatory Min. Term of Imprisonment (if applicable): N/A
* Max. Supervised Release: 3 years
* Max. Fine: $250,000 or twice the gross gain or loss from the offense

*Refers only to possible term of incarceration, supervised release and fines. It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) |
|---|---|
| v. | ) Case No. **25-CR-80105-MIDDLEBROOKS/MATHEWMAN** |
| | ) |
| Sean J. Alterman, | ) |
| *Defendant* | ) |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

**RYAN STUMPHAUZER, ESQ.**
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*